Suzanne BILELLO, Plaintiff,

v.

The ABBOTT LABORATORIES,
et al., Defendants.

Marie THEORET, Plaintiff,

v.

The ABBOTT LABORATORIES,
et al., Defendants.

Nos. CV92–5458, CV92–6136.

United States District Court,
E.D. New York.

July 2, 1993.

Sybil Shainwald, New York City, for plaintiffs.

Sills, Cummis, Zuckerman, Radin, Tischman, Epstein & Gross, New York City by Barry Epstein, Marc S. Klein, for defendant E.R. Squibb & Sons.

## MEMORANDUM AND ORDER

WEINSTEIN, Senior District Judge:

Defendant's motion to disqualify the trial judge is denied. The court met on the record with named plaintiff and several other DES plaintiffs and at numerous times with counsel for both sides together and separately. They revealed all of the prospective evidence in these cases in great detail. These conferences were conducted in the court's role as settlement judge. There is no basis for an objective observer to question the court's neutrality. There is no appearance of partiality. Disqualification is not warranted.

I. FACTS

These two cases were recently consolidated for trial. They stem from the ingestion of the drug diethylstilbestrol ("DES"), a synthetic estrogen, decades ago. *See In re DES Cases,* 789 F.Supp. 552, 558–59 (E.D.N.Y. 1992). Plaintiffs' mothers each allegedly took DES to prevent a miscarriage.

Plaintiff Suzanne Bilello, a resident of New York State, alleges that as a result of her prenatal exposure to DES in 1955–1956 she has developed abnormalities of the reproductive tract and infertility. Plaintiff Marie Theoret, a Canadian citizen, claims that she developed a form of vaginal cancer as a result of her exposure to the drug in 1956–1957. There has been extensive motion practice and discovery in these cases. They are ready for trial.

At one time more than five hundred DES cases were pending against scores of defendants in New York State alone in federal and state courts. Since it was estimated that individual trials of these cases would have required more than fifty judge-years and thousands of jurors, a Special Master was jointly appointed for the state and federal cases to assist the parties in settling the cases. *In re New York County DES Litigation,* 142 F.R.D. 58 (E.D.N.Y.1992). Settlement of the state cases involving this defendant was made more difficult because orders to consolidate state cases for trial were appealed and have remained undecided for some time.

There has been extraordinary cooperation between the state and federal courts and among the parties to the litigation in connection with settlement negotiations. Through the efforts of the Special Master, Kenneth R. Feinberg, Esq., about half of the cases have been settled. Many defendants have entered into global settlements with all plaintiffs. Other cases are currently in negotiations.

In May and June of 1992, this court, in its settlement role, met in chambers on four occasions, on the record, with plaintiffs' counsel in the instant case, a number of DES daughters and one DES son as well as a number of family members. These were representative plaintiffs, engaged in settlement negotiations, who desired to share their DES experiences with the court, to express their views about the litigation and to hear from the court how the cases might be resolved without trial. At the time of these meetings no DES cases were pending before the federal court because those that had been pending had been tried or settled. This court, in cooperation with New York State Supreme Court Justice Ira Gammerman, was continuing to assist in settling all state cases.

The women recounted tragic stories of how DES had affected their lives. Helene G., a DES mother, lost her eighteen year old daughter to cancer. Thirty-eight year old Charlotte L. told of countless surgeries in twenty-four years and more than eight years of infertility treatments with medical costs exceeding $113,000. Deena H. described her fear at learning that she had a recurrence of clear cell cancer, six years after she was told she was cured. She described the pain and humiliation of the invasive procedures to which she has been subjected in attempting a permanent cure. Margaret B. recounted how at barely nineteen she discovered she had vaginal cancer. Nine years later she developed lymphedema which caused her body to swell to such gross proportions that she was unable to sit or stand. She described her humiliation at being deposed about her sexuality. Susan H. described the gynecological problems she has been experiencing since the age of fourteen. As a result of developing vaginal cancer at age twenty-one, she had a radical hysterectomy and vaginectomy. Because her vagina was reconstructed with her colon, she had to catheterize herself daily. Her bout with vaginal cancer has resulted in three surgeries and ten hospitalizations. She was dropped by one health insurer. The insurance she currently maintains at extremely high premiums gives little protection. She is infertile and lives in constant fear of a recurrence of cancer.

These were but a sample of the stories that the court heard during those sessions. In addition, the court received letters from several DES victims, some of which were read into the record. Each letter was acknowledged by the court. Each was filed and docketed.

The court explained to the participants some of the problems associated with DES litigation such as those associated with causation. The court also outlined the law of New York respecting market share (see *Hymowitz v. Eli Lilly & Co.*, 73 N.Y.2d 487, 541 N.Y.S.2d 941, 539 N.E.2d 1069 (Ct.App.), *cert. denied sub nom. Rexall Drug Co. v. Tigue*, 493 U.S. 944, 110 S.Ct. 350, 107 L.Ed.2d 338 (1989)) and the extension of the statute of limitations (see N.Y. CPLR 214–c). The women were informed of the difficulty in bringing cases to trial because of lack of judicial resources and of the courts' efforts to settle the cases. The court expressed regret that the law was not in a position to help establish a fund to benefit those who suffer from DES exposure, as requested by some of those present, similar to the funds' established for victims of asbestos, Agent Orange and the Dalkon Shield intra-uterine device.

The court maintained its neutrality at all times. It noted the importance of giving due process to both plaintiffs and defendant drug companies. Above all, the court emphasized the desirability that these cases be settled so that plaintiffs could put the matter behind them and get on with their lives.

At the close of the May 27 meeting, a woman whose name is recorded in the transcript as "Susan Bill" recounted her experiences as a DES daughter, including her ever-present fear of developing clear cell cancer and her inability to have biological children. The woman referred to as Susan Bill is, it is stipulated, the plaintiff, Suzanne Bilello, in the instant case. She had also submitted two letters to the court.

The May 27 meeting was reported on *Newsday.* See Pamela Newkirk, *Victims of DES Testify, Newsday*, May 28, 1992 at 6. The article described how the court listened intently and sympathetically to "wrenching stories of cancer and infertility." *Id.* The reporter characterized the session as providing an opportunity for the women to "put their tragic experiences on the record finally after years of waiting for their day in court." *Id.*

The court, together with the Special Master and his staff, has been working with the parties in the case in an attempt to reach a settlement for these and over one hundred other pending cases. The parties disagree about a fair settlement figure. At the court's suggestion, the Special Master utilized a settlement formula to guide the parties and the court. The relatively high historical settlements achieved by attorney for plaintiffs were analyzed case-by-case and were averaged. The same calculation was made for the historical settlements of defendant. Recent settlement figures were isolated to determine what, if any, trends there have been in settlement values for the last year. In the course of these settlement discussions, the court became fully aware of the contentions of all parties. The detailed contentions of defendants as to the instant cases were presented forcefully.

Defendant moves to disqualify the court based on the court's *ex parte* communication with Ms. Bilello at the May 27 meeting. Defendant urges that disqualification is now required because the court has personal knowledge of disputed evidentiary facts and the situation is one that has the appearance of partiality. Moreover, defendant argues that the court's contact with plaintiff was extrajudicial because it did not center around any pending case. Defendant also contends that the court's sympathetic attitude toward these DES plaintiffs requires disqualification.

## II. LAW

"Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). The judge shall also disqualify him- or herself "[w]here he has ... personal knowledge of disputed evidentiary facts concerning the proceeding." *Id.* at § 455(b)(1). "Because of [the] general provision of § 455(a), an overly-nice reading is not required of the specific instances of disqualification spelled out in § 455(b)." 13A Charles A. Wright, Arthur R. Miller and Edward H. Cooper, *Federal Practice and Procedure* § 3549 (Supp.1993). *See generally* Susan B. Hoekema, *Comment, Questioning the Impartiality of Judges: Disqualifying Federal District Under 28 U.S.C. § 455(a).*, 60 Temple L.Q. 697 (1987).

Section 455(a) embodies an objective standard. The test is whether "a reasonable person, knowing all the facts, [would] conclude that the trial judge's impartiality could reasonably be questioned." *United States v. Lovaglia,* 954 F.2d 811, 815 (2d Cir.1992). *See also DeLuca v. Long Island Lighting Co., Inc.,* 862 F.2d 427 (2d Cir.1988) ("The test for an appearance of partiality is ... whether an objective, disinterested observer fully informed of the facts underlying the grounds on which recusal was sought would entertain a significant doubt that justice would be done in the case."), *citing, Pepsico, Inc. v. McMillen,* 764 F.2d 458, 460 (7th Cir.1985); *In re Drexel Burnham Lambert Inc.,* 861 F.2d 1307, 1309 (2d Cir.1988) ("[T]he test of impartiality is what a reasonable person, knowing and understanding all the facts and circumstances, would believe."); *In re Int'l Business Machines Corp.,* 618 F.2d 923, 929 (2d Cir.1980) (section 455(a) creates a so-called "appearance of justice" rule).

■ The fact that the judge is capable of discharging his duties free from bias or prejudice is not the measure. *See Haines v. Liggett Group Inc.,* 975 F.2d 81, 96 (3d Cir. 1992) (even though trial court is capable of performing impartially, disqualification may be required because "the polestar is *'[i]mpartiality and the appearance of impartiality.'* ") (emphasis in original); *United States v. Torkington,* 874 F.2d 1441, 1447 (11th Cir.1989) (even though district judge is able to act impartially, disqualification responds "to the appearance of a lack of neutrality" and the court "preserve[s] in the public mind the image of absolute impartiality and fairness of the judiciary"); *United States v. Pepper & Potter, Inc.,* 677 F.Supp. 123, 126 (E.D.N.Y.1988) (court is required to recuse itself, even though its impartiality is not questioned by either party, because of judge's limited involvement in the case while serving as United States Attorney, of which the court had no recollection, would likely give rise to an appearance of impartiality). The courts must take into account the fact that "people who have not served on the bench are often all too willing to indulge suspicions and doubts concerning the integrity of judges." *Liljeberg v. Health Services*

*Acquisition Corp.,* 486 U.S. 847, 864–65, 108 S.Ct. 2194, 2204–05, 100 L.Ed.2d 855 (1988).

The purpose of section 455(a) is "to promote public confidence in the integrity of the judicial process" which "does not depend upon whether the judge actually knew of facts creating an appearance of impropriety, so long as the public might reasonably believe that he or she knew." *Liljeberg v. Health Services Acquisition Corp.,* 486 U.S. 847, 860, 108 S.Ct. 2194, 2203, 100 L.Ed.2d 855 (1988). "Thus, if a judge's partiality might be reasonably questioned, recusal is warranted even if the judge in fact holds no bias." *Panel Discussion: Disqualification of Judges (The Sarokin Matter): Is it a Threat to Judicial Independence?,* 59 Brooklyn L.Rev. 1063, 1072 (1993). *See, e.g., In re School Asbestos Litig.,* 977 F.2d 764, 781 (3d. Cir.1992) (reasonable person might question partiality of trial judge who attended "a predominantly pro-plaintiff conference on a key merits issue" that was funded by plaintiffs). A reasonable person might suspect that a judge who has an opportunity to "preview" plaintiff's case is predisposed to the plaintiff's position. *Id.* at 782.

The litigant's belief that he or she has had a fair trial must be protected. "The ability to seek another judge protects the perception of fairness." *United States v. Escobar,* 803 F.Supp. 611, 615 (E.D.N.Y.1992) (permitting peremptory challenge of judge in a capital case). "[T]o perform its high function in the best way 'justice must satisfy the appearance of justice.' " *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955), *citing, Offutt v. United States,* 348 U.S. 11, 14, 75 S.Ct. 11, 13, 99 L.Ed. 11 (1954).

■ A judge's supposed knowledge of the facts of the case, in some instances, is not sufficient to require disqualification. *See generally* 13A Charles A. Wright, Arthur R. Miller and Edward H. Cooper, *Federal Practice and Procedure* § 3543 (2d ed. 1984); *United States v. Professional Air Traffic Controllers Org.,* 527 F.Supp. 1344, 1359 (N.D.Ill.1981) (disqualification not required based on conversations overheard or observations made during judge's visit to Air Traffic Control Center); *United States v. Coven,*

662 F.2d 162, 168 (2d Cir.1981), *cert. denied,* 456 U.S. 916, 102 S.Ct. 1771, 72 L.Ed.2d 176 (1982) (no recusal where judge heard incriminating evidence about defendants when the government sought her approval of an agreement by a receiver she had appointed to cooperate in a criminal investigation). Although there is a duty to avoid *ex parte* communication, not every *ex parte* communication with the trial court requires recusal. *Price Bros. Co. v. Philadelphia Gear Corp.,* 629 F.2d 444, 446 (6th Cir.1980).

▆▆ Disqualification is usually warranted when critical prejudicial knowledge is obtained from an extrajudicial source. *United States v. Grinnell Corp.,* 384 U.S. 563, 583, 86 S.Ct. 1698, 1710, 16 L.Ed.2d 778 (1966); *Apple v. Jewish Hosp. and Med. Center,* 829 F.2d 326, 333 (2d Cir.1987) (disqualification denied as untimely); *In re Int'l. Business Machines Corp.,* 618 F.2d 923, 928–29 (2d Cir.1980) (recusal not warranted where claim of prejudice based solely on judge's conduct and rulings in the case at hand). Facts learned by the judge while acting in his judicial capacity cannot form the basis for disqualification. *United States v. Bernstein,* 533 F.2d 775, 785 (2d Cir.), *cert. denied,* 429 U.S. 998, 97 S.Ct. 523, 50 L.Ed.2d 608 (1976); *Person v. General Motors Corp.,* 730 F.Supp. 516, 518 (W.D.N.Y.1990). Furthermore, "mere allegation that conduct is extrajudicial does not make it so." *Allen–Myland v. Int'l. Business Machines Corp.,* 709 F.Supp. 491, 494 (S.D.N.Y.1989).

It is well established and appropriate for judges to meet with counsel and parties in connection with settlement negotiations. Federal Rule of Civil Procedure 16 encourages judges to take an active role in the settlement of civil suits. Judicial involvement in settlement is increasing. *See* Scott A. Miller, *Note, Expanding the Federal Courts Power to Encourage Settlement Under Rule 16: G. Heileman Brewing v. Joseph Oat,* 1990 Wisc.L.Rev. 1399; Peter H. Schuck, *The Role of Judges in Settling Complex Cases: The Agent Orange Example,* 53 U.Chi.L.Rev. 337 (1986); D. Marie Provine, *Settlement Strategies for Federal District Judges* (Federal Judicial Center 1986).

The judge, as case manager, relies on settlement-enhancing procedures to help contain the costs of litigation and to keep cases moving forward.... Clients are potential allies in the effort to arrive at dispositions that are economically rational and that occur as early in the life of the case as possible.

*Id.* at 18. *But see* Owen M. Fiss, *Against Settlement,* 93 Yale L.J. 1073, 1075 (1984) ("[S]ettlement is a capitulation to the conditions of mass society and should be neither encouraged nor praised."). Settlement meetings can take place with all sides present at once as well as with only one side present. Particularly where there will be an impartial jury that will decide the case and the facts revealed in settlement discussions will be revealed again at trial, it is assumed that the settling judge will not be adversely affected by the discussions.

It is not unusual to require the parties as well as counsel to appear at settlement conferences. Counsel often request the court to explain the litigation's posture and the advantages and disadvantages of trial and of settlement. Mediation is particularly encouraged. United States District Court, Eastern District of New York, *Dispute Resolution Procedures Available in the East District of New York,* V. Settlement Conferences Conducted by a Judge or Magistrate Judge, 13–14 (1992).

▆▆ Concern about a case and litigants expressed by a judge during the course of settlement negotiations are not extrajudicial in nature. *Johnson v. Trueblood,* 629 F.2d 287, 291 (3d Cir.1980), *cert. denied,* 450 U.S. 999, 101 S.Ct. 1704, 68 L.Ed.2d 200 (1981). *See also Anderson v. Sheppard,* 856 F.2d 741, 750 (6th Cir.1988) (where matters complained of take place during settlement proceedings, "vigorous expression of opinion as to the desirability of a settlement" is not basis for disqualification); *Franks v. Nimmo,* 796 F.2d 1230 (10th Cir.1986) (attempt to encourage settlement beneficial to movant does not give rise to appearance of impartiality within the meaning of § 455(a)); *Smith v. Sentry Ins.,* 752 F.Supp. 1058 (N.D.Ga.1990) (pretrial settlement conference where court made "well-informed observations" as to

merits of plaintiff's case are not grounds for disqualification). "Such a rule would unduly hamper the judge's ability to effectuate settlement." *Johnson v. Trueblood*, 629 F.2d 287, 291 (3d Cir.1980), *cert. denied,* 450 U.S. 999, 101 S.Ct. 1704, 68 L.Ed.2d 200 (1981). As one court astutely observed:

> If comments made by a court in the course of pretrial proceedings ... were regarded as extrajudicial, the court's ability to promote the settlement of civil litigation would be crippled. Judicial intervention in the settlement process, even if not universally favored or practiced, is an absolute necessity in the federal judicial system, burdened. as it is by a staggering and ever-growing case load. Without that intervention ... the federal courts would be hopelessly congested with little chance for civil litigants who must have a trial to get one, at least within a reasonable time. Conversely, that intervention frequently helps to avoid the expense of litigation, thereby serving. the purpose of the Federal Rules of Civil Procedure "to secure the just, speedy, and inexpensive determination of every action." Rule 1, Fed.R.Civ.Pro.... Intervention may, of course, take many different forms depending on the personality, style and experience of the individual judge.... To subject judges to the risk of disqualification on the basis of [expression by the judge of his reactions to the case] would jeopardize their effectiveness as catalysts in the settlement process.

*Fong v. American Airlines, Inc.,* 431 F.Supp. 1334, 1338–89 (N.D.Cal.1977). *See also In re Joint E. & S. Dist. Asbestos Litig.,* 737 F.Supp. 735, 738 (E. & S.D.N.Y.1990) (without settlement efforts by judges and others, the court calendar system would break down and many litigants would find the doors to the courthouse closed).

In attempting to effect settlement, the judge's role will vary based on his or her temperament, style, philosophy and the nature of the case. *Manual for Complex Litigation* § 23.11 (2d ed. 1985). He or she may serve as facilitator, counselor or optimizer. *See generally* Stephen McG. Bundy, *The Policy in Favor of Settlement in an Adversary System,* 44 Hastings L.J. 1, 58–78 (1992). *See also* Hubert L. Will, Robert R. Merhige Jr. and Alvin B. Rubin, *The Role of the Judge in the Settlement Process,* 75 F.R.D. 89 (1977) (also published by the Federal Judicial Center).

While a judge is required to rule impartially, he or she should not be expected to be devoid. of any human emotion. "Judges, while expected to possess more than the average amount of self-restraint, are still only human." *United States v. Weiss,* 491 F.2d 460, 468 (2d Cir.), *cert. denied,* 419 U.S. 833, 95 S.Ct. 58, 42 L.Ed.2d 59 (1974). "Judges are not required to sit stone-faced and erect at all times and to refrain from reacting to an event at which they are presiding." *Lamborn v. Dittmer,* 726 F.Supp. 510, 517.(S.D.N.Y:1989). *See* David Margolick, *At the Bar: Conspicuous Compassion Does Not Equal Bias,* N.Y. Times, May 21, 1993 at B9 (describing how an Indiana appeals court rejected a disqualification argument that was based on the fact that the judge cried after hearing a woman who was brutally raped and beaten show forgiveness and compassion toward her attacker on the witness stand).

## III. APPLICATION OF LAW TO FACTS

■ The court's meeting with plaintiff Bilello and other DES plaintiffs was both appropriate and desirable. During the settlement process there is often a need for the court to communicate with the parties. Plaintiffs, particularly in mass cases, may feel alienated and disenfranchised. They often fail to understand how the system operates and where they "fit" in the complex web of motions, depositions and negotiations. They have a need to vent, to express their frustrations, to feel that the system really cares about what happened to them. Such communication provides them with a sense that they have participated meaningfully in the judicial process, that their voices have been heard. Public confidence in our system of justice depends on the system's responsiveness to people's needs.

Any personal knowledge of disputed evidentiary facts gleaned by the court stemmed

from the court's role as settlement judge. The court's meeting with plaintiffs' attorney and a group of her clients was not extrajudicial. Nor did the fact that there was no DES case technically pending before the court at the time of the meeting render the court's actions extrajudicial. To hold otherwise would discourage judges from participating in the settlement process in a cooperative agreement with state judges. The federal court system, as well as the state system, is already seriously backlogged. *See* 28 U.S.C. § 471 *et seq.* (The Civil Justice Reform Act of 1990) (mandating that each district court implement a civil justice expense and delay reduction plan). Without the participation of the judge in the settlement process, civil litigants would be adversely affected. Federal and state judges have an obligation to cooperate in clearing the dockets of both courts.

There is no basis in fact for a claim of partiality. The transcript of the proceedings reveals that the court remained neutral. At no time did the court demonstrate that it favored plaintiffs' position over that of defendant drug manufacturers. It indicated that it had no interest in whether the parties settled. It explained that it could not go beyond assigning the Special Master to bring counsel together for the benefit of clients. The court emphasized its responsibility to all the people of the Eastern District of New York. The court made no factual findings nor did it reach any legal conclusions as a result of the meeting with plaintiff. The presence of one future DES plaintiff, unknown to the court at the time, cannot, without more, form the basis for disqualification. Moreover, the court has been made fully aware of the positions of both sides in the instant cases through its participation in the recent settlement negotiations.

Defendants cannot rely on the court's expressed sympathy to the severe medical problems and losses experienced by these plaintiffs as a basis for disqualification. It would be unreasonable for defendants to expect this judge, or any other human being, not to be moved by such tragic tales of years of suffering. Defense counsel themselves have evinced much sympathy during settlement conferences as well as trial. The fact that a judge empathizes with other human beings does not render him or her partial. Were that the case, the only judges who would be able to preside over cases involving serious injury and suffering would be those who lack compassion—hardly a qualification for judicial duties at the trial level.

The court had already presided over several DES cases and understood well the suffering caused by DES exposure. The DES stories were as heart-wrenching as the stories told by families who suffered from the effects of asbestos or Agent Orange.

## IV.  CONCLUSION

Defendant's motion to disqualify the trial judge is denied.

SO ORDERED.